# EXHIBIT A

## IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

PEMBERTON, INC.           )
                                 )
                                 )
                                 )
       Plaintiff,            )
                                 )
v.                              )    CIVIL ACTION NO.: CV-06-  1059
                                 )
GEORGIA MUTUAL         )
INSURANCE and ZURICH     )
AMERICAN INSURANCE      )
COMPANY                )
                                 )
       Defendants.         )

FILED
CIRCUIT COURT OF
MONTGOMERY COUNTY
2006 APR 17 PM 1:03

## COMPLAINT

## STATEMENT OF PARTIES.

1.     Plaintiff, Pemberton, Inc., ("Pemberton") is an entity doing business in Montgomery County, Alabama.

2.     Defendant, Georgia Mutual Insurance Company ("Georgia Mutual"), is a Georgia corporation doing business in Montgomery County, Alabama.

3.     Defendant, Zurich American Insurance Company ("Zurich"), is an Illinois corporation doing business in Montgomery County, Alabama.

## STATEMENT OF FACTS.

4.     The incident made the basis of this suit occurred in Montgomery County, Alabama.

5.     Luis Silva ("Silva") was killed and David Sanchez ("Sanchez") was injured while working for John Jarman d/b/a Jarman Construction on a construction project for a Coosa County school being built in Rockford, Alabama.

6.     Jarman Construction and Alaquana Construction, LLC ("Alaquana") were performing work on the project under subcontracts with Pemberton. A copy of the subcontracts are attached as exhibit "A" and incorporated by reference.

7.     Article IX of the subcontract required Jarman and Alaquana (as the subcontractors) to defend and indemnify Pemberton (as the general contractor) for any loss or expenses on account of the injury or death to persons (including the subcontractor's employees) arising out of or sustained in connection with the performance of the subcontract.

8.     Jarman and Alaquana agreed to reimburse Pemberton for any expenses, including reasonable attorney's fees, incurred by Pemberton as a result of injury or death.

9.    The subcontracts further required Jarman and Alaquana to procure liability insurance to insure the liability of the parties (including Pemberton) for any injuries for the subcontractor's employees.

10.    Jarman obtained a commercial liability policy from Georgia Mutual. Georgia Mutual refused to defend and indemnify Pemberton and its employees in this case.

11.    Alaquana obtained a commercial liability policy from Zurich. Zurich refused to defend and indemnify Pemberton and its employees in this case.

## COUNT I (Breach of Contract).

12.    Plaintiff avers that on September 12, 2003 there were in full force and effect polices of insurance issued by defendants, Georgia Mutual and Zurich, providing plaintiff, Pemberton and its employees, with liability coverage.  The defendants agreed to provide the plaintiff with protection against claims for bodily injury and death in consideration of the premiums paid to them.

13.    Silva was killed and Sanchez was injured as a result of the negligence of Jarman Construction and Alaquana.

3

14.    As a proximate cause of the defendants failure to defend and indemnify Pemberton and its employees, Pemberton has been caused to incur the following damages:

    (a)    attorney's fees in the defense of the case;

    (b)    expert fees and litigation expenses; and,

    (c)    exposure to a potentially adverse jury verdict.

WHEREFORE, plaintiff demands judgment against the defendants, jointly and severely, in an amount in excess of the jurisdictional limits of this court, to be determined by a jury, which will fairly and adequately compensate the plaintiff for injuries and damages sustained, together with interest from the date of injury, and the cost of this proceeding. Further, plaintiff requests that the jury selected to hear this case render a verdict for plaintiff and against each defendant.

## COUNT II (Bad Faith).

15.    Plaintiff hereby reallege all the allegations contained in paragraphs 1-14 as set out in both letter and number.

16.    Plaintiff alleges that the above actions by the defendants, Georgia Mutual and Zurich, constitute breach of contract, bad faith and failure to the pay the defense and indemnity of Pemberton and its employees. As a result of the defendants' breach of contract, bad faith and failure to pay, the plaintiffs were caused to suffer substantial monetary damage and other damages.

WHEREFORE,    plaintiff demands judgment against the defendants, jointly and severely, in an amount in excess of the jurisdictional limits of this court, to be determined by a jury, which will fairly and adequately compensate the plaintiff for injuries and damages sustained, together with interest from the date of injury, and the cost of this proceeding. Plaintiff further requests that the jury selected to hear this case render a verdict for plaintiff and against each defendant, and that it award punitive damages to plaintiff in an amount which will adequately reflect the enormity of the defendants' wrongful acts and which will effectively prevent other similar wrongful acts.

R.    Larry    Bradford,    Attorney    for
Defendant, Pemberton, Inc.
Attorney Bar Code: BRA039

Shane T. Sears, Attorney for Defendant,
Pemberton, Inc.
Attorney Bar Code: SEA026

OF COUNSEL:

Bradford & Sears, P.C.
2020 Canyon Road
Suite 100
Birmingham, AL 35216
(205) 871-7733

**PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY.**

Shane T. Sears, Attorney for Defendant,
Pemberton, Inc.
Attorney Bar Code: SEA026

DEFENDANTS TO BE SERVED BY CERTIFIED MAIL AS FOLLOWS:

Georgia Mutual Insurance Company
c/o C. Spencer Hostetter
6579 Peachtree Industrial Blvd.
Norcross, GA 30092

Zurich American Insurance Company
The Corporation Company
2000 Interstate Park Dr. Ste 204
Montgomery, AL 36109

# PEMBERTON, INC.
P.O. Box 210067
Montgomery, Alabama 36121-0067
### SUBCONTRACT
— with —

JARMAN CONSTRUCTION
Amount **$259,378.00**

THIS AGREEMENT entered into this 16TH day of _____ August ____ , by and between PEMBERTON, INC., Montgomery, Alabama, hereinafter called Contractor, and _____

hereinafter called Subcontractor, _____

WITNESSETH that, WHEREAS, Contractor has heretofore entered into a General Contract with _____

COOSA COUNTY BOARD OF EDUCATION

_____ , hereinafter called the Owner, to furnish all labor and materials and perform all work required for

COOSA COUNTY CONSOLIDATED SCHOOLS

in accordance with the specifications, schedules and drawings        6-3-02
prepared by _____    BARGANIER DAVIS SIMS   _____
Architect and/or Engineer, which are made a part of said General Contract, and which are now made a part of this subcontract insofar as they apply, and the parties hereto desire to contract with reference to a part of said work.

NOW, THEREFORE, in consideration of the mutual agreements herein contained, it is agreed as follows:

ARTICLE 1 — Subcontractor shall furnish all labor, materials, fuel, equipment, tools, machinery and supplies; perform all work; and do all things necessary to complete the following part or parts of the work of the General Contract in all respects as is therein required of Contractor, and all work incidental thereto, namely:

ALL LABOR TO POUR & FINISH SLAB INCLUDING POUROUS FILL, VISQUEEN & CURING SAW CUTTING, FOOTINGS INCLUDING RE-BAR, FOUNDATION BLOCK FILL.  ALL LABOR TO ERECT BUILDING TRUSSES AND ALL FASCIA FRAMING, DECKING, FELT AND RELATED BRACING INCLUDING DRAFTSTOPS.  PEMBERTON TO FURNISH BACKHOE JARMAN TO FURNISH CRANE.  ALL WORK AS PER PLANS & SPECS & ADDENDUMS YOU MUST HAVE A STATE GENERAL CONTRACTORS LICENSE ALL OSHA AND SAFETY REQUIREMENTS TO BE MET.  ABSOLUTELY ALL TRASH CREATED BY THIS SUB SHALL BE MOVED TO A CENTRAL LOCATION AS DESIGNATED BY PEMBERTON, INC.  WORKMAN'S COMPENSATION LIABILITY INSURANCE IS REQUIRED.



EXHIBIT
A

Sheet No. 1 of 4

Subcontract No. _____        164-03-1

ARTICLE II—(a) Contractor shall ... 've the same rights and privileges as agair ... Subcontractor herein as the Owner in the General Contract has against ( ... ctor.

(b) Subcontractor acknowledges ... e has read the general contract and is familiar with each and every part of said general contract affecting his operation together with all related plans, specifications, general and special provisions incidental thereto and by examination has satisfied himself as to the nature and location of the work, the character, quantity and kinds of materials to be encountered and the character, kind and quantity of equipment needed during the prosecution of the work and location, conditions and other matters which can in any manner affect the work under this agreement. Further, said Subcontractor is familiar with respective rights, powers, benefits and liabilities of the Contractor and the Owner thereunder and agrees to comply with and perform all provisions thereof applicable to Subcontractor.

(c) All work shall be done under the direction of the Owner or Owner's representative and his decisions as to the true construction and meaning of the drawings and specifications shall be final, subject to sub-paragraph (e) and Article III (a) below. Subcontractor shall conform to and abide by any additional specifications, drawings or explanations by the Owner to illustrate the work to be done.

(d) Subcontractor shall procure at his own expense all required permits and licenses.

(e) Contractor shall have the right, but not the obligation, to inspect all working drawings, to inspect all work required of the Subcontractor hereunder, and all such working drawings and work shall be subject to approval of the Contractor. Contractor shall have the right, but not the obligation, to inspect equipment of Subcontractor, to inspect all work required of the Subcontractor, and all such working drawings and work shall be subject to approval of the Contractor. Contractor shall be subject to approval of the Subcontractor's work. It is expressly understood that the approval of the Subcontractor's equipment and ings and inspection of the Subcontractor's work and equipment is general only, and such approval or inspection will not relieve the Subcontractor from any responsibility whatsoever.

(f) Subcontractor expressly agrees that the provisions of the general conditions in the general contract between the Contractor and the Owner governing Disputes and Appeals shall be applicable to all disputes arising out of or in connection with this subcontract.

ARTICLE III—(a) Subcontractor shall begin work as soon as instructed by Contractor and shall carry on said work promptly, efficiently and at a speed that will not cause delay in the progress of Contractor's work or other branches of the work carried on by other subcontractors. Contractor may, from time to time, reschedule the order of the work to be performed and may require Subcontractor to prosecute, in preference to other parts of the work, such part or parts as Contractor may specify. Contractor may require weekly conferences at the job site. Subcontractor's authorized representative shall attend each conference held while Subcontractor's work is under way and on such other occasions as required by Contractor.

(b) Subcontractor, at Contractor's request and at the time specified in such request, shall submit to Contractor progress, procurement and man-hour completion schedules, satisfactory in form and content to Contractor, and upon Contractor's acceptance of the schedules, shall prosecute the work in accordance therewith, subject to the provisions of Article III (a) above.

(c) Any damages for delay caused by Subcontractor, including actual damages which Contractor sustains or for which Contractor is liable to others, and including any damages, liquidated or otherwise, for which Contractor is liable to Owner, or as results of Subcontractor's failure to comply with progress schedules required by Article III (b) above, shall be deducted by the Contractor from the contract sum for said work as liquidated damages and not as a penalty. If such deduction results in an overpayment, Subcontractor shall pay Contractor such overpayment on demand.

(d) Contractor shall not be liable to Subcontractor for delay to Subcontractor's work by the act, neglect or default of the Owner or Owner's representative, or by reason of fire or other casualty, or on account of riots or strikes, or other combined action of the workmen or others, or on account of any acts of God, or any other cause beyond the Contractor's control, or any circumstance caused or contributed to by any subcontractor or any other party performing a part of the work; but Contractor will cooperate with Subcontractor to enforce any just claim against the Owner or Owner's representative for delay. Contractor shall be reimbursed by Subcontractor for any expense, including attorney's fees, in connection with any claims asserted at the request of Subcontractor.

(e) Should Subcontractor be delayed in his work by Contractor, then Contractor shall owe Subcontractor therefor only an extension of time for completion equal to the delay caused, and then only if written claim for delay is made to Contractor within forty-eight (48) hours from the time of the beginning of the delay.

(f) Subcontractor shall remove from the premises, as often as directed by the Contractor, all rubbish and surplus material which may accumulate from the prosecution of said work, and shall clean up any adjacent work soiled by his workmen and shall leave floors "broom clean." Should Subcontractor fail to do so, Contractor may, at his option perform same at Subcontractor's expense.

ARTICLE IV—(a) Subcontractor shall make all alterations, furnish material for and perform all extra work or omit any work the Owner or Owner's representative may require, and at a reasonable addition to or deduction from the contract price hereinafter set forth and pro rata to the same. NO ALTERATIONS OR CHANGES SHALL BE MADE, HOWEVER, EXCEPT UPON WRITTEN ORDER FROM CONTRACTOR, AND CONTRACTOR SHALL NOT BE HELD LIABLE TO SUBCONTRACTOR FOR ANY EXTRA LABOR, MATERIALS OR EQUIPMENT FURNISHED WITHOUT SUCH WRITTEN ORDER. The amount to be paid by Contractor, or allowed by Subcontractor, as a result of such changes or alterations shall be stated in such order, if the amount can be agreed upon; but if not, then Subcontractor shall follow the appeal procedure set up in the General Contract between the Owner and Contractor (such appeal to be at Subcontractor's expense); and provided, further that where the General Contract contains no appeal provisions, then it shall be fixed by arbitration as provided in Article XIII hereinbelow; but, meanwhile, the work shall proceed as directed.

(b) Subcontractor shall submit proposals for alterations or changes in the manner provided in the General Contract, unless instructed otherwise by Contractor.

(c) Subcontractor shall submit all claims for extra costs in the manner provided in the General Contract, un... Contractor for transmittal to the Owner. Any statement herein to the contrary notwithstanding, as to any extra work, in no event shall Contractor be liable to Subcontractor for an amount greater than the amount received by Contractor from Owner for such part of extra work performed by Subcontractor, less Contractor's normal overhead and profit.

ARTICLE V—Subcontractor shall provide safe and sufficient facilities at all times for inspection of the work by Contractor, Owner, or their duly authorized representatives, and shall, within twenty-four (24) hours after written notice from Contractor proceed promptly to take down all portions of the work and remove from the grounds and buildings all material, whether worked or unworked, which the Contractor, Owner or Owner's representative shall condemn or fail to approve, and shall promptly make good all such work and all other work damaged or destroyed in removing or making good said condemned work.

ARTICLE VI—(a) Subcontractor shall at all times supply adequate tools, appliances and equipment, a sufficient number of properly qualified workmen and a sufficient amount of materials and supplies of proper quality to prosecute said work efficiently and promptly, and to maintain progress in accordance with progress schedules provided for in Article III (b) above. If, in the opinion of Contractor, Subcontractor falls behind said schedules, Subcontractor shall take such steps as may be necessary to improve his progress, and Contractor may require him, after having given one week's notice in writing, to increase the number of shifts, to institute or increase overtime operations, to increase his forces and equipment, and to take such other steps as may reasonably be required in order to make the Subcontractor's progress conform to such schedules, all without additional cost to Contractor. If Subcontractor fails to comply with any such requirements, such failure shall be deemed a breach of this agreement and Contractor may, in addition to any other remedies Contractor may have under this agreement, withhold all payments due Subcontractor until Subcontractor's progress conforms to such schedules.

(b) Subcontractor shall promptly pay for all materials purchased, and shall pay all workmen each week, at Contractor's request, shall obtain and furnish Contractor weekly with signed receipts from all workmen showing the date of payment

amount paid, number of hours paid ✻ ___ days on which said work was perform ___ classification of the labor so paid
and the rate of wages per hour paid ___ ___ Contractor's request, shall supply Contractor weekly with a reasonable number
of copies of payroll, verified by Subcontractor.

(c) The Subcontractor shall provide adequate supervision of the work and shall have a competent foreman or superintendent satisfactory to Contractor on the work at all times during progress, with authority to act for Subcontractor.

(d) Subcontractor shall furnish all temporary heat, power, water, watchmen, ice water and sanitary facilities required for Subcontractor's portion of the work.

(e) Any of the following shall constitute default in all events under this subcontract:
(1) Failure to provide bond as herein provided,
(2) Failure to pay payroll when due,
(3) Failure to commence correction of faulty work within three days after written notice to proceed,
(4) Failure to properly man the job within five days after written notice,
(5) Failure to pay any sums due hereunder within ten days after written demand, and
(6) Failure to perform any other obligations of Subcontractor hereunder.

ARTICLE VII—To secure performance by Subcontractor and any funds expended by Contractor hereunder, Contractor shall have a lien upon all materials, tools, appliances and equipment of Subcontractor on the premises or used in connection with said work.

ARTICLE VIII—(a) Subcontractor shall turn said work over to Contractor in good condition and free and clear of all claims, encumbrances and liens and shall protect and save harmless Contractor and Owner from all claims, encumbrances and liens growing out of the performance of this Subcontract. Any fees or expenses incurred by the Contractor on account of default by the Subcontractor or on account of claims against the Contractor or Subcontractor by third parties arising out of matters covered in this subcontract shall be chargeable to the Subcontractor, who agrees to pay such reasonable fees and expenses, including reasonable attorneys' fees. Any statement herein to the contrary notwithstanding, Contractor shall have the right, but not the obligation to defend any such claims against the Subcontractor, at the Subcontractor's expense.

(b) Subcontractor shall, as often as required by the Owner or Contractor, furnish a sworn statement showing all parties who furnish labor or materials to Subcontractor, with their names and addresses and the amount due or to become due each. Like statement may be required from any subcontractors of Subcontractor.

(c) Subcontractor agrees to, and does hereby, guarantee his work against all faulty workmanship or defective materials a period of one year from the date of completion and final acceptance of the entire project by the Owner.

ARTICLE IX—(a) Subcontractor agrees to indemnify, hold and save harmless Contractor against all loss, cost or expense required in the General Contract, expressed or implied; or if no guarantee is required by the General Contract, then for on account of injury (including death) to persons (including but not limited to the public and its agents, servants and employees of said Contractor and Subcontractor) or on account of damage to property occurring in, arising out of, or sustained in connection with the performance of said subcontract. Subcontractor shall defend all suits brought against Contractor (in which connection Subcontractor shall employ only lawyers acceptable to Contractor) on account of any such injuries or damage and shall reimburse Contractor for any expense, including reasonable attorney's fees, sustained by Contractor by reason of such injury or damage. In the event Subcontractor uses any of Contractor's tools, equipment, scaffolds, ladders or temporary facilities, Subcontractor shall hold Contractor harmless from all claims growing out of the use thereof.

(b) Subcontractor shall carry such public liability insurance and also such employer's liability or workmen's compensation insurance as may be necessary to insure the liability of the parties hereto for any injuries to Subcontractor's employees, and all insurance required by the law of the place where said work is to be done, and shall furnish Contractor with satisfactory evidence that such insurance has been obtained and paid for and will continue in force until the completion of said work. If Subcontractor should sublet any of this work to a third party, Subcontractor shall see that said third party shall do likewise.

(c) Subcontractor, as a part of the obligations assumed by him in this subcontract, accepts exclusive liability for all taxes and contributions required of the Contractor or Subcontractor by the Federal Social Security Act and the Unemployment Compensation Law or similar law in any state with respect to the employees of Subcontractor in the performance of the work here in provided for, and agrees to furnish Contractor with suitable written evidence that he has been authorized to accept such liability. Subcontractor further agrees that if he cannot furnish said evidence, or should fail to do so, prior to beginning his work, Contractor may, at his option, pay or reserve for payment said taxes and contributions and deduct the amount paid or reserved from payments due or to become due Subcontractor. Subcontractor agrees to protect Contractor against all liability in respect to said employees under said Act or Law, or otherwise.

(d) Subcontractor accepts exclusive liability for any and all sales tax or use tax which may be assessed against material equipment or labor used in his part of the work or which may arise out of this subcontract.

(e) Subcontractor shall, at the time and in the manner provided, abide by and conduct the work hereunder in full compliance with any and all applicable federal, state, local and municipal laws, ordinances and orders, and any and all rules and regulations of governmental boards and bureaus, and shall hold harmless Contractor from any and all liability with respect thereto.

ARTICLE X—All labor used throughout the work shall be acceptable to the Contractor and the Owner, and Subcontractor shall use such labor as will not impede progress of any part of the work under the General Contract, and the Subcontractor's failure to employ such labor as will permit work to be carried on harmoniously and without delay on this project, or on any other project where Contractor is employed, shall give the Contractor the option of terminating this subcontract and proceed in accordance with Article XV.

ARTICLE XI—Subcontractor agrees to indemnify and save harmless Contractor from any and all claims or suits for infringement of patents, or violation of patent rights, by Subcontractor, and further agrees to pay all loss and expense incurred by Contractor by reason of any such claims or suits, including attorney's fees.

ARTICLE XII—Contractor agrees to pay Subcontractor for said work ~~TWO HUNDRED FIFTY NINE THOUSAND THREE HUNDRED SEVENTY EIGHT~~ ___ ___ Dollars (any exchange shall be borne by Subcontractor), subject to additions and deductions as hereinbefore provided, payable as the work progresses, based on estimates submitted by Subcontractor and approved by Contractor, and subject to receipt by Contractor of payment from the Owner. Contractor may, at his option, retain ___ % of each estimate until final payment and may withhold payment of any estimate until Subcontractor has furnished Contractor with suitable evidence that he has paid in full for all labor, materials and supplies used in the work through the date of the estimate. Final payment shall be made within ___60___ days after the completion of the work included in this subcontract, written acceptance by the Owner or Owner's representative and full payment therefor by the Owner; except that Contractor may deduct from such final payment all sums due to Contractor from Subcontractor under this subcontract or otherwise.

ARTICLE XIII—If any question of fact shall arise under this contract and there is no provision for settlement in the General Contract, then either party hereto may demand an arbitration in accordance with the rules of the American Arbitration Association then obtaining. The written decision of such arbitration shall be final and binding on both parties hereto and judgment upon the decision may be entered in any court having jurisdiction thereof. Each party shall pay one-half of the expenses of such reference, unless otherwise provided in such decision.

Sheet No. 3 of 4

164-03-1
Subcontract No. ___

4

ARTICLE XIV—Subcontractor shall within ten days from date hereof separate performance and payment bonds, pa able to Contractor, each in the sum of $_____, on the forms attached, with surety thereon sat factory to Contractor, for the faithful performance of this subcontract, including changes or modifications thereto witho consent of surety, and for the payment of all labor, services, equipment, tools, machinery, equipment and machinery ren materials and supplies, and all other items of cost or expense incurred by Subcontractor in the prosecution of said wo

Premium on said bonds is to be paid by _____ NA _____

ARTICLE XV—(a)  Should Subcontractor at any time breach this agreement or fail to prosecute the said work wi promptness, diligence and efficiency or fail to perform any of the requirements hereof, Contractor may without notice (or if r tice be required by Law, then after twenty-four (24) hours' written notice either by registered mail addressed to Subcontrac at _____ SAME AS ABOVE _____

payment of any estimate and may, in addition to all other rights of the Contractor hereunder, proceed as follows:
1.  Provide such materials, supplies, equipment, machinery, tools, labor and supervision as may be necessary to complete s work, pay for same and deduct the amount so paid from any money then or thereafter due Subcontractor, or
2.  Terminate the employment of Subcontractor, enter upon the premises and take possession, for use in completing t work, of all the materials, supplies, tools, equipment, machinery and appliances of Subcontractor thereon and complete t work, or have same completed by others, and be liable to Subcontractor for no further payment under the agreement un final payment is due, and then only if and to the extent that the unpaid balance of the amount to be paid under this subc tract exceeds the expense of Contractor in finishing the work.
(b)  If the amount expended by Contractor under "1" above and/or the cost of completing the work under "2" above, c ceeds the unpaid balance of subcontract price herein stated, Subcontractor shall pay Contractor such excess upon dema Further, any election by Contractor to proceed under "1" above shall not preclude a subsequent election to proceed under " above.
(c)  Should Subcontractor at any time fail to pay for all labor, materials or supplies used by Subcontractor in said wo when due, Contractor, at its option, may pay for same and charge to Subcontractor; or Contractor, at its discretion, and w the consent of Subcontractor, may pay at any time claims for labor, materials and supplies used in the work and charge sa to Subcontractor.
(d)  Should Subcontractor default in any of the provisions hereof, or to collect damages for breach of the subcontract, or to recover on the bonds mentioned in A ticle XIV above, Subcontractor and his surety agree to pay Contractor such reasonable attorney's fees and other costs a may expend therein.
(e)  The rights and remedies granted to Contractor under this article and pursuant to the other provisions of this su tract shall be cumulative and are not intended to be in lieu of any legal right or remedy which Contractor may have aga Subcontractor for breach of this subcontract or default hereunder afforded by state or federal law.

ARTICLE XVI—(a)  Subcontractor shall not sublet, assign or transfer this subcontract, or any part thereof, without written consent of Contractor. However, in event of a subletting, assignment or transfer of this subcontract as between Contractor and Subcontractor herein, the Subcontractor shall remain fully bound to the Contractor under all terms of agreement, as if there had been no subletting, assignment or transfer of this subcontract or any part thereof.
(b)  In all events Subcontractor, in addition to all Subcontractor's other obligations hereunder, shall be liable for and s indemnify and hold harmless the Contractor from any and all claims of every kind and character which may be made by or the account of any subcontractor of the Subcontractor herein and from all claims of every character and description which be made against any subcontractor of the Subcontractor herein named herein.

ARTICLE XVII—This subcontract contains the entire agreement between the parties and all additions thereto or char therein shall be in writing and shall not be binding unless same are in writing.

ARTICLE XVIII—The Subcontractor agrees that, if in the event of renegotiation or contract termination, or information lating to renegotiation or contract termination is required by the Owner, it will upon demand of an authorized representativ the Contractor and/or Owner, furnish all information necessary for such renegotiation or contract termination proceedings

ARTICLE XIX—In the event Subcontractor obtains approval of any material or method of operation which will in any make changes in, or add to the work, or cost thereof, to be done by the Contractor or any of his other Vendors or Subcont tors, Subcontractor shall be responsible for the additional cost of such changes. Submittals in connection with request for provals as well as routine specifications and drawings submittals shall clearly identify by specific reference any proposed d ation from contract drawings and specifications.

ARTICLE XX—In the event any options are permitted under the plans and specifications for the furnishing of mate and performance of work by this subcontract, Subcontractor may exercise such options only in such manner that a finished with respect to the finished products or work provided hereunder will be obtained without additional cost to Contractor or of its other Subcontractors or Vendors, even though items of work may be required under sections of the specifications o than those covered by this subcontract with respect to the products or work furnished hereunder.

ARTICLE XXI—Unless otherwise provided herein, any written notice provided for herein shall be effective at the tim posting in the U. S. Mails, postage prepaid, addressed to the parties at the addresses given herein.

ARTICLE XXII—In the event of any conflict between the terms of this subcontract and the terms of the General Cont with Owner, the terms of this subcontract shall govern.

ARTICLE XXIII—All obligations assumed by Subcontractor under this subcontract shall be at the expense of the Sub tractor.

ARTICLE XXIV—In case the Subcontractor is a firm or corporation, the singular pronoun "he" used herein shall be accordingly.

ARTICLE XXV—The provisions of the attached Rider and Attachment "A" complement and are made a part of this sub tract.

IN WITNESS WHEREOF, the parties hereto have caused this subcontract to be executed the day and year first above wr

WITNESSES: (One for each party)

JARMAN CONSTRUCTION

_____
(Witness for Subcontractor)

By _____ (Subcontractor)

Title _____ Owner

_____
Adam R. Pemberton
(Witness for Contractor)

PEMBERTON, INC. (Contractor)          PEMBERTO

By _____

Title _____ Pargo???

Sheet No. 4 of 4

164-03-1

Subcontract No. _____

# PEMBERTON, INC.

P.O. Box 210067
Montgomery, Alabama 36121-0067
*SUBCONTRACT*
— with —

ALAQUANA CONSTRUCTION, LLC

Amount SEE QUOTE

**THIS AGREEMENT** entered into this 6TH day of _____ August _____ , by and between **PEMBERTON, INC.,**

Montgomery, Alabama, hereinafter called Contractor, and _____

_____

hereinafter called Subcontractor,

**WITNESSETH** that, **WHEREAS,** Contractor has heretofore entered into a General Contract with _____

COOSA COUNTY BOARD OF EDUCATION

_____ , hereinafter called the Owner, to furnish all labor and materials and perform all work required for

COOSA COUNTY CONSOLIDATED SCHOOLS

_____

in accordance with the specifications, schedules and drawings _____ 6-3-02 _____
prepared by _____ BARGANIER DAVIS SIMS _____
Architect and/or Engineer, which are made a part of said General Contract, and which are now made a part of this subcontract insofar as they apply, and the parties hereto desire to contract with reference to a part of said work.
    **NOW, THEREFORE,** in consideration of the mutual agreements herein contained, it is agreed as follows:
    **ARTICLE 1 —** Subcontractor shall furnish all labor, materials, fuel, equipment, tools, machinery and supplies; perform all work; and do all things necessary to complete the following part or parts of the work of the General Contract in all respects as is therein required of Contractor, and all work incidental thereto, namely:

CONTRACT INCLUDES LAYING BLOCK & BRICK, CLEAN-UP AND RUBBING OF BLOCK.
LABOR AS PER FINAL QUOTE. SEE ATTACHED PAYMENT SCHEDULE.

YOU MUST HAVE A STATE GENERAL CONTRACTORS LICENSE
ALL OSHA AND SAFETY REQUIREMENTS TO BE MET. ABSOLUTELY ALL
TRASH CREATED BY THIS SUB SHALL BE MOVED TO A CENTRAL LOCATION
AS DESIGNATED BY PEMBERTON, INC. WORKMAN'S COMPENSATION
LIABILITY INSURANCE IS REQUIRED.

Sheet No. 1 of 4

164-03-2

Subcontract No. _____

ARTICLE II—(a) Contractor shall ha.e the same rights and privileges as agains. ..e Subcontractor herein as the Owner in the General Contract has against Contractor.

(b) Subcontractor acknowledges that he has read the general contract and is familiar with each and every part of said general contract affecting his operation together with all related plans, specifications, general and special provisi..s and conditions incidental thereto and by examination has satisfied himself as to the nature and character, kind and quantity of equipment needed during the prosecution of the work and location, conditions and other matters which can in any manner affect the work under this agreement. Further, said Subcontractor is familiar with respective rights, powers, benefits and liabilities of the Contractor and the Owner thereunder and agrees to comply with and perform all provisions thereof applicable to Subcontractor.

(c) All work shall be done under the direction of the Owner or Owner's representative and his decisions as to the true construction and meaning of the drawings and specifications shall be final, subject to sub-paragraph (e) and Article III (a) below. Subcontractor shall conform to and abide by any additional specifications, drawings or explanations by the Owner to illustrate the work to be done.

(d) Subcontractor shall procure at his own expense all required permits and licenses.

(e) Contractor shall have the right, but not the obligation, to inspect all working drawings, to inspect all work required of the Subcontractor hereunder, and all such working drawings and work shall be subject to approval of the Contractor. Contractor shall have the right, but not the obligation, to inspect equipment of Subcontractor, and the adequacy of such equipment shall be subject to approval of Contractor. It is expressly understood that the approval of the Subcontractor's working drawings and inspection of the Subcontractor's work and equipment is general only, and such approval or inspection will not relieve the Subcontractor from any responsibility whatsoever.

(f) Subcontractor expressly agrees that the provisions of the general conditions in the general contract between the Contractor and the Owner governing Disputes and Appeals shall be applicable to all disputes arising out of or in connection with this subcontract.

ARTICLE III—(a) Subcontractor shall begin work as soon as instructed by Contractor and shall carry on said work promptly, efficiently and at a speed that will not cause delay in the progress of Contractor's work or other branches of work carried on by other subcontractors. Contractor may, from time to time, reschedule the order of the work to be performed and may require Subcontractor to prosecute, in preference to other parts of the work, such part or parts as Contractor may specify. Contractor may require weekly conferences at the job site. Subcontractor's authorized representative shall attend each conference held while Subcontractor's work is under way and on such other occasions as required by Contractor.

(b) Subcontractor, at Contractor's request and at the time specified in such request, shall submit to Contractor progress, procurement and man-hour completion schedules, satisfactory in form and content to Contractor, and upon Contractor's acceptance of the schedules, shall prosecute the work in accordance therewith, subject to the provisions of Article III (a) above.

(c) Any damages for delay caused by Subcontractor, including actual damages which Contractor sustains or for which Contractor is liable to others, and including any damages, liquidated or otherwise, for which Contractor is liable to Owner, or as results of Subcontractor's failure to comply with progress schedules required by Article III (b) above, shall be deducted by Contractor from the contract sum for said work as liquidated damages and not as a penalty. If such deduction results in an overpayment, Subcontractor shall pay Contractor such overpayment on demand.

(d) Contractor shall not be liable to Subcontractor for delay to Subcontractor's work by the act, neglect or default of the Owner or Owner's representative, or by reason of fire or other casualty, or on account of riots or strikes, or other combined action of the workmen or others, or on account of any acts of God, or any other cause beyond the Contractor's control, or any circumstance caused or contributed to by any subcontractor or any other party performing a part of the work; but Contractor will cooperate with Subcontractor to enforce any just claim against the Owner or Owner's representative for delay. Contractor shall be reimbursed by Subcontractor for any expense, including attorney's fees, in connection with any claims asserted at the request of Subcontractor.

(e) Should Subcontractor be delayed in his work by Contractor, then Contractor shall owe Subcontractor therefor only an extension of time for completion equal to the delay caused, and then only if written claim for delay is made to Contractor within forty-eight (48) hours from the time of the beginning of the delay.

(f) Subcontractor shall remove from the premises, as often as directed by the Contractor, all rubbish and surplus material which may accumulate from the prosecution of said work, and shall clean up any adjacent work soiled by his workmen and shall leave floors "broom clean." Should Subcontractor fail to do so, Contractor may, at his option perform same at Subcontractor's expense.

ARTICLE IV—(a) Subcontractor shall make all alterations, furnish material for and perform all extra work or omit any work the Owner or Owner's representative may require, and at a reasonable addition to or deduction from the contract price hereinafter set forth and pro rata to the same. NO ALTERATIONS OR CHANGES SHALL BE MADE, HOWEVER, EXCEPT UPON WRITTEN ORDER FROM CONTRACTOR, AND CONTRACTOR SHALL NOT BE HELD LIABLE TO SUBCONTRACTOR FOR ANY EXTRA LABOR, MATERIALS OR EQUIPMENT FURNISHED WITHOUT SUCH WRITTEN ORDER. The amount to be paid by Contractor, or allowed by Subcontractor, as a result of such changes or alterations shall be stated in such order, if the amount can be agreed upon; but if not, then Subcontractor shall follow the appeal procedure set up in the General Contract between the Owner and Contractor (such appeal to be at Subcontractor's expense); and provided, further, that where the General Contract contains no appeal provisions, then it shall be fixed by arbitration as provided in Article XIII hereinbelow; but, meanwhile, the work shall proceed as directed.

(b) Subcontractor shall submit proposals for alterations or changes in the manner provided in the General Contract, unless instructed otherwise by Contractor.

(c) Subcontractor shall submit all claims for extra costs in the manner provided in the General Contract, through the Contractor for transmittal to the Owner. Any statement herein to the contrary notwithstanding, as to any extra work, in no event shall Contractor be liable to Subcontractor for an amount greater than the amount received by Contractor from Owner for such part of the extra work performed by Subcontractor, less Contractor's normal overhead and profit.

ARTICLE V—Subcontractor shall provide safe and sufficient facilities at all times for inspection of the work by Contractor, Owner, or their duly authorized representatives, and shall, within twenty-four (24) hours after written notice from Contractor, proceed promptly to take down all portions of the work and remove from the grounds and buildings all material, whether worked or unworked, which the Contractor, Owner or Owner's representative shall condemn or fail to approve, and shall promptly make good all such work and all other work damaged or destroyed in removing or making good said condemned work.

ARTICLE VI—(a) Subcontractor shall at all times supply adequate tools, appliances and equipment, a sufficient number of properly qualified workmen and a sufficient amount of materials and supplies of proper quality to prosecute said work efficiently and promptly, and to maintain its progress in accordance with progress schedules provided for in Article III (b) above. If, in the opinion of Contractor, Subcontractor falls behind said schedules, Subcontractor shall take such steps as may be necessary to improve his progress, and Contractor may require him, after having given one week's notice in writing, to increase the number of shifts, to institute or increase overtime operations, to increase his forces and equipment, and to take such other steps as may reasonably be required in order to make the Subcontractor's progress conform to such schedules, all without additional cost to Contractor. If Subcontractor fails to comply with any such requirements, such failure shall be deemed a breach of this agreement and Contractor may, in addition to any other remedies Contractor may have under this agreement, withhold all payments due Subcontractor until Subcontractor's progress conforms to such schedules.

(b) Subcontractor shall promptly pay for all materials purchased, and shall pay all workmen each week, at Contractor's request, shall obtain and furnish Contractor weekly with signed receipts from all workmen showing the date of payment.

Sheet No. 2 of 4

amount paid, number of hours paid for, the days on which said work was performed, the classification of the labor so paid and the rate of wages per hour paid and, at Contractor's request, shall supply Contractor weekly with a reasonable number of copies of payroll, verified by Subcontractor.

(c) The Subcontractor shall provide adequate supervision of the work and shall have a competent foreman or superintendent satisfactory to Contractor on the work at all times during progress, with authority to act for Subcontractor.

(d) Subcontractor shall furnish all temporary heat, power, water, watchmen, ice water and sanitary facilities required for Subcontractor's portion of the work.

(e) Any of the following shall constitute default in all events under this subcontract:
(1) Failure to provide bond as herein provided,
(2) Failure to pay payroll when due,
(3) Failure to commence correction of faulty work within three days after written notice to proceed,
(4) Failure to properly man the job within five days after written notice,
(5) Failure to pay any sums due hereunder within ten days after written demand, and
(6) Failure to perform any other obligations of Subcontractor hereunder.

ARTICLE VII—To secure performance by Subcontractor and any funds expended by Contractor hereunder, Contractor shall have a lien upon all materials, tools, appliances and equipment of Subcontractor on the premises or used in connection with said work.

ARTICLE VIII—(a) Subcontractor shall turn said work over to Contractor in good condition and free and clear of all claims, encumbrances and liens and shall protect and save harmless Contractor and Owner from all claims, encumbrances and liens growing out of the performance of this Subcontract. Any fees or expenses incurred by the Contractor on account of default by the Subcontractor or on account of claims against the Contractor or Subcontractor by third parties arising out of matters covered in this subcontract shall be chargeable to the Subcontractor, who agrees to pay such reasonable fees and expenses, including reasonable attorneys' fees. Any statement herein to the contrary notwithstanding, Contractor shall have the right, but not the obligation to defend any such claims against the Subcontractor, at the Subcontractor's expense.

(b) Subcontractor shall, as often as required by the Owner or Contractor, furnish a sworn statement showing all parties who furnish labor or materials to Subcontractor, with their names and addresses and the amount due or to become due each. Like statement may be required from any subcontractors of Subcontractor.

(c) Subcontractor agrees to, and does hereby, guarantee his work against all faulty workmanship or defective materials as required in the General Contract, expressed or implied; or if no guarantee is required by the General Contract, then for a period of one year from the date of completion and final acceptance of the entire project by the Owner.

ARTICLE IX—(a) Subcontractor agrees to indemnify, hold and save harmless Contractor against all loss, cost or expenses on account of injury (including death) to persons (including but not limited to the public and agents, servants and employees of said Contractor and Subcontractor) or on account of damage to property occurring in, arising out of, or sustained in connection with the performance of said subcontract. Subcontractor shall defend all suits brought against Contractor (in which connection Subcontractor shall employ lawyers acceptable to Contractor) on account of any such injuries or damage and shall reimburse Contractor for any expenses, including reasonable attorney's fees, sustained by Contractor by reason of such injury or damage. In the event Subcontractor uses any of Contractor's tools, equipment, scaffolds, ladders or temporary facilities, Subcontractor shall hold Contractor harmless from all claims growing out of the use thereof.

(b) Subcontractor shall carry public liability insurance and also such employer's liability or workmen's compensation insurance as may be necessary to insure the liability of the parties hereto for any injuries to Subcontractor's employees, and all insurance required by the law of the place where said work is to be done, and shall furnish Contractor with satisfactory evidence that such insurance has been obtained and paid for and will continue in force until the completion of said work, and if Subcontractor should sublet any of this work to a third party, Subcontractor shall see that said third party shall do likewise.

(c) Subcontractor, as a part of the obligations assumed by him in this subcontract, accepts exclusive liability for all taxes and contributions required of the Contractor or Subcontractor by the Federal Social Security Act and the Unemployment Compensation Law or similar law in any state with respect to the employees of Subcontractor in the performance of the work here-in provided for, and agrees to furnish Contractor with suitable written evidence that he has been authorized to accept such liability. Subcontractor further agrees that if he cannot furnish said evidence, or should fail to do so, prior to beginning his work, Contractor may, at his option, pay or reserve for payment said taxes and contributions and deduct the amount paid or reserved from payments due or to become due Subcontractor. Subcontractor agrees to protect Contractor against all liability in respect to said employees under said Act or Law, or otherwise.

(d) Subcontractor accepts exclusive liability for any and all sales tax or use tax which may be assessed against materials, equipment or labor used in his part of the work or which may arise out of this subcontract.

(e) Subcontractor shall, at the time and in the manner provided, abide by and conduct the work hereunder in full compliance with any and all applicable federal, state, local and municipal laws, ordinances and orders, and any and all rules and regulations of governmental boards and bureaus, and shall hold harmless Contractor from any and all liability with respect thereto.

ARTICLE X—All labor used throughout the work shall be acceptable to the Contractor and the Owner, and Subcontractor shall use such labor as will not impede progress of any part of the work under the General Contract, and the Subcontractor's failure to employ such labor as will permit work to be carried on harmoniously and without delay on this project, or on any other project where Contractor is employed, shall give the Contractor the option of terminating this subcontract and to proceed in accordance with Article XV.

ARTICLE XI—Subcontractor agrees to indemnify and save harmless Contractor from any and all claims or suits for infringement of patents, or violation of patent rights, by Subcontractor, and further agrees to pay all loss and expense incurred by Contractor by reason of any such claims or suits, including attorney's fees.

ARTICLE XII—Contractor agrees to pay Subcontractor, for said work _____
_____ SEE ATTACHED QUOTE DATED 7-15-02 _____
(any exchange shall be borne by Subcontractor), subject to additions and deductions as hereinbefore provided, payable as the work progresses, based on estimates submitted by Subcontractor and approved by Contractor, and subject to receipt by Contractor of payment from the Owner. Contractor may, at his option, retain ___5___% of each estimate until final payment and may withhold payment of any estimate until Subcontractor has furnished Contractor with suitable evidence that he has paid in full for all labor, materials and supplies used in the work through the date of the estimate. Final payment shall be made within ___60___ days after the completion of the work included in this subcontract, written acceptance by the Owner or Owner's representative and full payment therefor by the Owner; except that Contractor may deduct from such final payment any sums due to Contractor from Subcontractor under this subcontract or otherwise.

ARTICLE XIII—If any question of fact shall arise under this contract and there is no provision for settlement in the General Contract, then either party hereto may demand an arbitration in accordance with the rules of the American Arbitration Association then obtaining. The written decision of such arbitration shall be final and binding on both parties hereto and judgment upon the decision may be entered in any court having jurisdiction thereof. Each party shall pay one-half of the expenses of such reference, unless otherwise provided in such decision.

Sheet No. 3 of 4                                                                    164-03-2

                                                                    Subcontract No. _____

ARTICLE XIV—Subcontractor shall within ten NA days from date hereof separate performance and payment bonds, payable to Contractor, each in the sum of $_____NA_____, on the forms attached, with surety thereon satisfactory to Contractor, for the faithful performance of this subcontract including changes or modifications thereto without consent of surety, and for the payment of all labor, services, equipment, tools, machinery, equipment and machinery rental, materials and supplies, and all other items of cost NA or expense incurred by Subcontractor in the prosecution of said work. Premium on said bonds is to be paid by _____NA_____

ARTICLE XV—(a)  Should Subcontractor at any time breach this agreement or fail to prosecute the said work with promptness, diligence and efficiency or fail to perform any of the requirements hereof, Contractor may without notice (or if notice be required by Law, then after twenty-four (24) hours' written notice either by registered mail addressed to Subcontractor at SAME AS ABOVE _____, or by posting in some conspicuous place on the job) withhold payment of any estimate and may, in addition to all other rights of the Contractor hereunder, proceed as follows:

1. Provide such materials, supplies, equipment, machinery, tools, labor and supervision as may be necessary to complete said work, pay for same and deduct the amount so paid from any money then or thereafter due Subcontractor, or

2. Terminate the employment of Subcontractor, enter upon the premises and take possession, for use in completing the work, of all the materials, supplies, tools, equipment, machinery and appliances of Subcontractor thereon and complete the work, or have same completed by others, and be liable to Subcontractor for no further payment under the agreement until final payment is due, and then only if and to the extent that the unpaid balance of the amount to be paid under this subcontract exceeds the expense of Contractor in finishing the work.

(b)  If the amount expended by Contractor under "1" above and/or the cost of completing the work under "2" above, exceeds the unpaid balance of subcontract price herein stated, Subcontractor shall pay Contractor such excess upon demand. Further, any election by Contractor to proceed under "1" above shall not preclude a subsequent election to proceed under "2" above.

(c)  Should Subcontractor at any time fail to pay for all labor, materials or supplies used by Subcontractor in said work when due, Contractor, at its option, may pay for same and charge to Subcontractor; or Contractor, at its discretion, and with the consent of Subcontractor, may pay at any time claims for labor, materials and supplies used in the work and charge same to Subcontractor.

(d)  Should Subcontractor default in any of the provisions of this subcontract and should Contractor employ an attorney to enforce any provision hereof, or to collect damages for breach of the subcontract, or to recover on the bonds mentioned in Article XIV above, Subcontractor and his surety agree to pay Contractor such reasonable attorney's fees and other costs as it may expend therein.

(e)  The rights and remedies granted to Contractor under this article and pursuant to the other provisions of this subcontract shall be cumulative and are not intended to be in lieu of any legal right or remedy which Contractor may have against Subcontractor for breach of this subcontract or default hereunder afforded by state or federal law.

ARTICLE XVI—(a)  Subcontractor shall not sublet, assign or transfer this subcontract, or any part thereof, without the written consent of Contractor.  However, in event of a subletting, assignment or transfer of this subcontract as between the Contractor and Subcontractor herein, the Subcontractor shall remain fully bound to the Contractor under all terms of this agreement, as if there had been no subletting, assignment or transfer of this subcontract or any part thereof.

(b)  In all events Subcontractor, in addition to all Subcontractor's other obligations hereunder, shall be liable for and shall indemnify and hold harmless the Contractor from any and all claims of every kind and character which may be made by or for the account of any subcontractor of the Subcontractor herein and from all claims of every character and description which may be made against any subcontractor of the Subcontractor herein named herein.

ARTICLE XVII—This subcontract contains the entire agreement between the parties and all additions thereto or changes therein shall be in writing and shall not be binding unless same are in writing.

ARTICLE XVIII—The Subcontractor agrees that, if in the event of renegotiation or contract termination, or information relating to renegotiation or contract termination is required by the Owner, it will upon demand of an authorized representative of the Contractor and/or Owner, furnish all information necessary for such renegotiation or contract termination proceedings.

ARTICLE XIX—In the event Subcontractor obtains approval of any material or method of operation which will in any way make changes in, or add to the work, or cost thereof, to be done by the Contractor or any of his other Vendors or Subcontractors, Subcontractor shall be responsible for the additional cost of such changes. Submittals in connection with request for approvals as well as routine specifications and drawings submittals shall clearly identify by specific reference any proposed deviation from contract drawings and specifications.

ARTICLE XX—In the event any options are permitted under the plans and specifications for the furnishing of materials and performance of work by this subcontract, Subcontractor may exercise such options only in such manner that a finished job with respect to the finished products or work provided hereunder will be obtained without additional cost to Contractor or any of its other Subcontractors or Vendors, even though items of work may be required under sections of the specifications other than those covered by this subcontract with respect to the products or work furnished hereunder.

ARTICLE XXI—Unless otherwise provided herein, any written notice provided for herein shall be effective at the time of posting in the U. S. Mails, postage prepaid, addressed to the parties at the addresses given herein.

ARTICLE XXII—In the event of any conflict between the terms of this subcontract and the terms of the General Contract with Owner, the terms of this subcontract shall govern.

ARTICLE XXIII—All obligations assumed by Subcontractor under this subcontract shall be at the expense of the Subcontractor.

ARTICLE XXIV—In case the Subcontractor is a firm or corporation, the singular pronoun "he" used herein shall be read accordingly.

ARTICLE XXV—The provisions of the attached Rider and Attachment "A" complement and are made a part of this subcontract.

IN WITNESS WHEREOF, the parties hereto have caused this subcontract to be executed the day and year first above written

WITNESSES: (One for each party)

ALAQUANA CONSTRUCTION, LLC
(Subcontractor)

By _____

Title _____

_____
(Witness for Subcontractor)

PEMBERTON, INC. (Contractor)          PEMBERTON, INC

By _____

_____
(Witness for Contractor)

Title _____

Sheet No. 4 of 4

Subcontract No. _____

# EXHIBIT B

IN THE CIRCUIT COURT OF MONTGOMERY COUNTY, ALABAMA

| | | |
|---|---|---|
| DAN W. TALIAFERRO, | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO.: CV-04-2179 |
| PEMBERTON, INC., et al. | ) | |
| Defendants/Third Party Plaintiffs, | ) | |
| v. | ) | |
| ALAQUANA CONSTRUCTION, LLC., | ) | |
| Cross-Defendant, | ) | |
| DAVID SANCHEZ, | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION NO.: CV-05-2343 |
| PEMBERTON, INC., et al., | ) | |
| Defendants. | ) | |

## REPLY BRIEF IN SUPPORT OF MOTION FOR NEW TRIAL

COME NOW the Defendants, Pemberton Construction Company, Inc., Mike Jordan, and Adam Pemberton (collectively referred to herein as "Pemberton"), pursuant to Rule 59 of the Alabama Rules of Civil Procedure, and submit the following Reply Brief in Support of their Motion for New Trial.    Defendants adopt and incorporate all arguments made in their Motion for Summary Judgment, Statement of Undisputed Facts, Memorandum Brief in Support of Motion for Summary Judgment, Supplemental Memorandum Brief in Support of Motion for Summary Judgment, Motion for Judgment as a Matter of Law, Renewed Motion for Judgment as a Matter of Law, and all oral arguments presented to this Honorable Court.

## STANDARD FOR GRANTING A NEW TRIAL

"A new trial may be granted to all or any of the parties and (1) on all of the issues in an

action in which there has been a trial by jury, for any of the reasons for which new trials have

heretofore been granted in action at law in the courts of Alabama; and (2) on all or part of the

issues in an action tried without a jury, for any of the reasons for which rehearings have heretofore

been granted in suits in equity in the courts of Alabama." Ala. R. Civ. P. 59(a). "The power of the

trial court to grant a motion for a new trial is an inherent power that exists to prevent irreparable

injustice. . . " Spann v. Marine, 372 So. 2d 360, 362 (Ala. Civ. App. 1979) (citing City of Union

Springs v. Evans, 240 So. 2d 662 (Ala. 1970)). "[T]his power is also granted by statute." Id. (citing

Ala. Code § 12-13-11 (1975)). "The granting of a new trial motion does not deprive a party of his

right to a fair trial, but rather insures it." Id.

## ARGUMENT

I.    **THE COURT SHOULD GRANT A NEW TRIAL BECAUSE IT IMPROPERLY REFUSED TO CHARGE THE JURY ON THE LOANED EMPLOYEE OR BORROWED SERVANT DOCTRINE.**

Although Pemberton maintains that this Court should enter judgment as a matter of law

because substantial evidence demonstrates that Plaintiffs were loaned employees of Pemberton,

at a minimum there was a question of fact as to whether Plaintiffs were loaned employees or not.

Accordingly, this Court should have charged the jury on this critical question of fact. However, at

the close of trial, the Court denied Defendants' request to charge the jury on the "loaned employee"

or "borrowed servant" doctrine. In doing so, the Court deprived the Defendants of the right to allow

the jury to determine whether Plaintiffs were "loaned employees" or "borrowed servants" of the

Defendants. The Trial Court erred in this holding; therefore, Defendants' Motion for a New Trial

should be granted because the evidence presented in this case clearly warrants the submission

of this question to the jury.

2

"The 'exclusive remedy' provision of the Alabama Workmen's Compensation Act[1] has been extended to include "special employers," which have been described as "individuals or businesses who, for practical purposes, may be considered primary or co-employers of the injured employee."' Rhodes v. Ala. Power Co., 599 So. 2d 27, 28 (Ala. 1992) (quoting Tweedy v. Tenn. Valley Auth., 882 F. 2d 477, 479 (11th Cir. 1989)). The Supreme Court of Alabama has held whether one is a "special employee" is to be determined by a three-part test: (1) whether the employee has made a contract of hire, expressed or implied, with the special employer; (2) whether the work being done is essentially that of the special employer; and (3) whether the special employer has the right to control the details of the work.[2] Terry v. Read Steel Products, 430 So. 2d 862, 865 (Ala. 1983). *"If reasonable persons can reach different conclusions on the question of whether a servant of one employee has temporarily become the servant of another, it is a question of fact for the jury."* Coleman v. Steel City Crane Rentals, Inc., 475 So. 2d 498, 501 (Ala. 1985) (citing U.S. Steel Corp. v. Mathews, 73 So. 2d 239, 242 (Ala. 1954)) and Hauseman v. Univ. of Ala. Health Services Foundation, 793 So. 2d 730, 736 (Ala. 2001) (emphasis added). Additionally, if one is considered a special employee of one employer that does not mean they are not employee of the primary employer. "When all three of the above conditions are satisfied in relation to both employers, both employers are liable for workmen's compensation. . ." Terry, 430 So. 2d at 865.

---

[1] The present case is governed by the Alabama Worker's Compensation Act. Ala. Code § 25-5-53. In their response, the Plaintiffs rely on the decision rendered in Cooks v. Bender Shipbuilding and Repair Co., Inc., 833 So. 2d 631 (Ala. 2001). The Cooks decision was decided under the Longshore Harbor Workers' Compensation Act of the United States Code. 33 U.S.C.A § 905(a). The present facts do not warrant the application of maritime law thereby making the Cooks decision inapplicable.

[2] "Loaned employee", "borrowed servant", and "special employee" are used interchangeably.

3

### A.    A jury question exists as to whether an implied contract for hire existed between Plaintiffs and Pemberton.

At a minimum, a jury question existed as to whether there was an implied contract of hire between Plaintiffs and Defendants.  "[I]n determining whether a special employment relationship exists 'the most important criterion to be scrutinized is the requirement of a contract of hire, express or implied.'" Hicks v. Ala. Power Co., 623 So. 2d 1050, 1053 (Ala. 1993) (quoting Terry, 430 So. 2d at 866).  In the present action, when the Court did not charge the jury on the loaned servant question, the Court effectively granted judgment as a matter of law to Plaintiffs on this issue.  This was error and warrants a new trial.

The evidence showed that there was no contract between Jarman and Pemberton for the additional work performed by the Plaintiffs and that Pemberton specifically hired the Plaintiffs for a specified task.  Jarman testified that two weeks after they finished the job for Pemberton, Mike Jordan of Pemberton contacted him seeking some men to use for some additional work Pemberton was doing. Jordan specifically requested Plaintiff Silva. The evidence also showed that Pemberton was responsible for supervising the work performed by Plaintiffs.  Such facts clearly indicate that an implied contract for hire existed between Plaintiffs and Pemberton.  Additionally, evidence was produced that Defendants paid for Plaintiffs' worker's compensation insurance. See Marlow v. Mid South Tool Comp., Inc., 535 So. 2d 120, 123-124 (Ala. 1988) (The Alabama Supreme Court noted that it was of "particular importance" that the special employer had paid the worker's compensation premiums of the special employee.) Moreover, **Plaintiffs own expert** admitted that Plaintiffs were loaned to Pemberton by Jarman for a specific service and were under the exclusive and direct operative control of Pemberton thereby making them employees of Pemberton.

In Hicks, the Supreme Court of Alabama reversed summary judgment in favor of the defendants holding there was a genuine issue of material fact for the jury to determine as to 1) whether there was an implied contract for hire between defendant and plaintiff and 2) whether

4

defendant was a special employer of the plaintiff for purposes of the exclusivity provision of the Worker's Compensation Act. Hicks, 623 So. 2d 1050. The evidence in Hicks demonstrated that the defendant contracted with a third-party to provide it with construction workers. Id. at 1051. One of the workers the third-party provided to the defendant was the plaintiff, who was subsequently injured on the premises of the defendant. Id. The defendant argued that plaintiff's acknowledgment that the third-party was a "manpower supplier" illustrated the plaintiff's awareness and understanding of the working relationship between defendant and the third-party thus indicating plaintiff's submission and acquiescence to defendant's supervisory role. Id. at 1053. The defendant in Hicks further argued that this evidence, combined with evidence that the defendant controlled the details of Plaintiff's work, conclusively established that an implied contract of hire existed between the plaintiff and defendant. Id. However, the plaintiff presented evidence that his consent to employment for the defendant may not be implied. Id. at 1055.

Just as the plaintiff in Hicks presented substantial evidence that there was not an implied contract for hire between him and the defendant, thereby creating a jury question, the Defendants in the present action have also produced evidence that there was an implied contract for hire between them and Plaintiffs - again, thereby creating a jury question. If the evidence presented by the plaintiff in Hicks warranted reversal of summary judgment, evidence presented by Defendants in the present case warrants the submission of the question to the jury as to whether the Plaintiffs were special employees of Defendants. Accordingly, it was error for the Court to refuse to charge the jury on the loaned servant doctrine and to effectively enter judgment as a matter of law in favor of Plaintiffs.

The evidence presented shows there was a jury question as to whether an implied contract for hire existed between the Plaintiffs and Defendants which would create a special employment relationship between the Defendants and Plaintiffs. The Defendants respectfully request this Honorable Court reverse its holding and grant a new trial allowing the jury to consider the evidence

5

produced as to whether such an implied contract existed.

**B.     A jury question exists as to whether the work performed by Plaintiffs was essentially that of Defendants.**

The work performed by the Plaintiffs was essentially that of the Defendants.   The undisputed evidence demonstrates that Plalintiffs were hired by Pemberton to perform work for Pemberton in the cupola.  In <u>Bechtel v. Crown Central Petroleum Corp.</u>, 495 So. 2d 1052 (Ala. 1986), the Supreme Court of Alabama held it could not be seriously disputed that the work performed by the plaintiff was the work of her special employer because there was no evidence that such work was not the work of the defendant. <u>Bechtel</u>, 495 So. 2d at 1054.  Just as in the case of <u>Bechtel</u>, where summary judgment in favor of the defendant was upheld because the defendant was the special employer of the plaintiff, in the present action there has been no evidence produced indicating the work performed by Plaintiffs was not that of Defendants.  Furthermore, there has been extensive evidence that Plaintiffs were performing the work of Defendants. The evidence showed this work was not contemplated within the contract with Jarman, and further was arranged by Pemberton upon request to Jarman to hire two of its employees.  The work performed by Plaintiffs was the work of Defendants.  John Jarman testified at trial that he did not supervise the Plaintiffs nor did he have knowledge of the details of the work performed by the Plaintiffs on the day of the accident.  However, Mike Jordan of Pemberton did have knowledge of the details of the work performed by the Plaintiffs.  In fact, Jordan showed Plaintiffs the drawing of the work to be done in the cupola and he instructed Plaintiffs as to what work had to be done in the cupola on the morning of the accident.  Jordan further testified that the Plaintiffs were performing the work he instructed them to do when they fell.

The evidence in the present case shows that the Plaintiffs were operating as general construction employees of Pemberton under instruction by Pemberton as to what work they were to perform and that the Plaintiffs' general employer did not have knowledge as to what work

Plaintiffs were performing when the accident occurred. Accordingly, the work being performed by the Plaintiffs was essentially that of the Defendants.

### C.    A jury question exists as to whether Pemberton had the right to control the details of the work performed by Plaintiffs.

The third factor in determining whether an employee has become a loaned servant for the purposes of the exclusivity provision of the Workmen's Compensation Act is to look at "[w]hose work was the employee doing and under whose control was he doing it." Hauseman, 793 So. 2d at 736. "It is not the actual exercise of control which is determinative but rather the reserved right to control the employee." Id. (citing U.S. Steel Corp. v. Mathews, 73 So. 2d 239, 242 (Ala. 1954)).

The evidence showed that Jarman was contacted by Mike Jordan regarding the use of workers in the cupola area after Jarman had fulfilled its contractual obligations to Pemberton. Jarman spoke with Bill Pemberton about the use of Plaintiffs for work to be done for Pemberton. Jarman also testified that Bill Pemberton told him Mike Jordan - Pemberton's employee - would supervise Plaintiffs. In fact, the testimony showed that Jarman relied on Jordan to supervise the Plaintiffs. Jarman further admitted that his only understanding of the work being performed was that the Plaintiffs were putting up beams. Plaintiffs' own expert testified that he did not believe Jarman was involved with the supervision of the work and Plaintiffs were loaned to Pemberton thereby making them employees of the Defendants. Finally - and of critical significance - Jarman testified that Pemberton had the ability to terminate Plaintiffs at anytime.

In Rhodes, 599 So. 2d 27 (Ala. 1992), the Supreme Court of Alabama upheld summary judgment in favor of the defendant holding that the elements of the special employer defense were met. Rhodes, 599 So. 2d at 29. The plaintiff's argument against summary judgment was limited to the third prong of the Terry test, i.e., the defendant's right to control the details of his work. Id. The Court did not find persuasive plaintiff's argument that "because Sullivan retained a right to control it employees, Alabama Power did not have such a right." The Court held:

7

> The third element of the "special employer" doctrine recognizes that both the general employer and the special employer may have concurrent rights to control the employee of both employers. The focus is on whether "the *special employer* has the right to control the details of the work" of the employee, not which of the employers has such a right.

Id. (emphasis in original). The Court held that the defendant had the right to control the details of the work performed by the plaintiff. Id. The plaintiff even stated in his deposition that the defendant supervised the third-party's employees and that the employees received all of their work instructions from the defendant. Id.

At a minimum, reasonable minds could differ as to whether the Pemberton reserved the right to control the work performed by Plaintiffs. Just like the defendant in Rhodes, evidence in the present case shows that Defendants, not Jarman, were responsible for supervising Plaintiffs. Moreover, unlike the defendant in Rhodes, Pemberton also had the ability to fire Plaintiffs at any time.

Whether Defendants or Jarman individually had the right to control Plaintiffs is immaterial for purposes of the exclusivity provision of the Workmen's Compensation Act. Rhodes, 599 So. 2d at 29. The fact that Jarman retained the right to control Plaintiffs is also immaterial. Id. The focus is whether Defendants had the right to control the details of the work performed by Plaintiffs. Id. The evidence presented clearly indicates that reasonable minds could infer that Defendants had such a right, especially considering the fact that Plaintiffs' own expert testified that Plaintiffs were loaned employees of Defendants. Therefore, the charge of the loaned servant doctrine should have been given to the jury and not foreclosed as a matter of law.

In Pinson v. Ala. Power Co., 557 So. 2d 1236 (Ala. 1990), the Alabama Supreme Court upheld summary judgment in favor of the defendant holding there was a special employer/employee contract implied in fact. This holding was such as a matter of law even though (1) there was a contract that designated the plaintiff as an employee of the third-party (not the defendant/special-employer); and (2) the third-party was on the site supervising the plaintiff. Id.

8

The Supreme Court rejected the argument that an employee who is contractually designated as an employee of one party could not also be the employee of another. <u>Pinson</u>, 557 So. 2d at 1238.

The argument for Pemberton in the present case is more substantial than that of the defendant in <u>Pinson</u>. Here, unlike <u>Pinson</u>, there was no contract designating the Plaintiffs as employees of Jarman nor did Jarman supervise the Plaintiffs on site. Even though the Plaintiffs were employees of Jarman, just as the plaintiff was the employee of the third-party in <u>Pinson</u>, that does not negate the fact that he was also a special employee of the defendants at the time of the accident. Taking the foregoing rationale and evidence into consideration, there are clearly questions of fact to be answered by a jury as to whether the Plaintiffs were special employees of Pemberton.

The evidence presented should entitle Pemberton to judgment as a matter of law as to the special employee/employer issue, but at a minimum, the evidence presented clearly creates a fact question as to whether the Plaintiffs were "special employees" of Pemberton. The Defendants request that a new trial be granted and the borrowed servant or loaned employee doctrine be charged to the jury, thus affording the Defendants with the right to have the jury weigh the evidence presented in this case.

## II.    THE COURT IMPROPERLY ALLOWED THE PLAINTIFFS TO IMPEACH MIKE JORDAN WITH CONFIDENTIAL AND PRIVILEGED PSYCHOLOGICAL RECORDS.

A new trial should be granted because the Court erred in allowing Plaintiffs to present evidence from Mike Jordan's psychological records concerning his prior drug use. This Honorable Court erred when it allowed these medical records to be used to impeach Defendant Jordan's testimony on the ground that counsel for the Plaintiffs did not lay the proper foundation, among other grounds.

The same issue in the present case was addressed in <u>White Consolidated Industries, Inc.</u>

9

v. American Liberty Ins. Co., 617 So. 2d 657 (Ala. 1993).[3]  The Supreme Court of Alabama held

that "if those records are offered for the purpose of putting into evidence a prior inconsistent

statement of the witness, as these were, then the party offering the record is required to lay a

predicate for their introduction."  White, 617 So. 2d at 659.  The Court went on to hold that

"[a]lthough these records were kept in the regular course of business by the medical clinic and are

admissible by an exception to the hearsay rule, they may not be used to impeach the witness with

a prior inconsistent statement unless the proper predicate is laid."  White, 617 So. 2d at 656-60.

In its decision the Supreme Court looked to the following excerpt from McElroy's Alabama

Evidence:

> When a witness, on cross-examination, denies that [she] made a statement out of
> court which is inconsistent with [her] testimony on direct examination, the only
> available move for the impeaching party is to bring on an impeaching witness who
> can testify as to the prior inconsistent statement of the witness being impeached.
> Before such extrinsic evidence may be elicited, however, it is the general rule that
> the impeaching party must lay a proper predicate by asking the party being
> impeached whether [she] made such statement [,] specifying with reasonable
> certainty the time when, the place where, the person to whom such supposed
> statement was made and the substance for such statement.[4]

White, 617 So. 2d at 660 (quoting McElroy's Alabama Evidence, § 157.01(1)-(4) (4th ed. 1991)

(footnotes omitted)).  "This Court has held that '[t]o impeach a witness with a prior inconsistent

statement counsel must ask [her] specifically about the statement at issue, with reference to the

time and place at which [s]he allegedly made it and the person to whom it was made, and give [her]

an opportunity to admit or to deny having made it.'"  White, 617 So. 2d at 660 (quoting Perry v.

---

[3]In White, the plaintiff testified on direct examination that she had never had any
problems with her back whatsoever before she dropped from her window to escape a fire.
Defendant sought to impeach her with records made by a doctor consulted by plaintiff where
she told the doctor she suffered from back pain before the incident but such records were
disallowed.  White, 617 So. 2d at 659.

[4]The most recent edition of McElroy's Alabama Evidence states ". . . the impeaching
party is to bring on extrinsic proof - either in the form of a writing, tape recording or impeaching
witness who can testify as to the prior inconsistent statement."  C. Gamble, McElroy's Alabama
Evidence § 155.01(1) (5th ed. 1996).

10

Brakefield, 534 So. 2d 602, 606 (Ala. 1988)).

Applying the foregoing to the case at hand, it was clearly improper and contrary to Alabama Rules of Evidence for the Plaintiffs' counsel to use the medical records to impeach Defendant Mike Jordan.  The counsel for the Plaintiffs did not lay the proper foundation to impeach Jordan with the records because counsel did not (1) ask Jordan specifically about the statement at issue, (2) made no reference to the time and place at which he allegedly made it, nor (3) asked to whom it was made.  White, 617 So. 2d at 660.  Plaintiffs' attorney simply asked Jordan if he used drugs on the day the accident occurred, and when Jordan answered in the negative, the Plaintiffs' attorney wrongly questioned him about the medical records without first laying the proper foundation. Accordingly, it was error for this Honorable Court to permit the Plaintiffs' counsel to impeach Jordan with his medical records from Bradford, thus Defendants' Motion for a New Trial should be granted.

## III.     THE JURY IMPROPERLY REACHED AND RETURNED A QUOTIENT VERDICT.

Defendants' Motion for a New Trial should be granted because the evidence presented indicates that the jury reached a quotient verdict.  "In order for there to be a quotient verdict the members of the jury must agree (1) that each juror will specify the figure which he recommends and that all figures will be added together and the sum divided by the number of jurors, and (2) that all the jurors will be bound by, and accept as their verdict, the quotient thereby obtained."  Security Mutual Finance Corp. v. Harris, 261 So. 2d 43, 46 (Ala. 1972).  "[I]t has become established that where evidence is presented of scraps of paper, lists of figures and other memoranda, indicating that the jury used the quotient process and obtained a quotient which corresponds with the amount of the verdict or approximates it, a presumption arises and a prima facie case is made that the jurors have improperly used the quotient process in connection with an antecedent agreement to be bound by the amount of the quotient and that they have thus rendered an invalid quotient verdict."  Id.  "But, precise agreement between the quotient found and the verdict returned, is not

11

required." Id. at 45. "[Q]uotient verdicts are invalid, even if the amount of the verdict is not exactly, but only approximately, the same as the amount of the quotient arrived at by the jury." v.'arner v. Elliot, 573 So. 2d 275, 277 (Ala. 1990) (citing International Agriculture Corp. v. Abercrombie, 63 So. 2d 549 (Ala. 1913)). "Furthermore, when such figures are established, it also must be presumed that, in advance of the figuring, there was an agreement to be bound by the result. The reason for this presumption is that a witness cannot state that prior to the quotient process such an agreement was made." Alabama Power Co. v. Thomas, 280 So. 2d 778, 780 (Ala. 1973).

In the present case several pieces of paper were retrieved from the trash can of the jury's deliberation room shortly after the verdict was reached. Those pieces of paper reflect different amounts of money. It should be presumed that the verdict reached by the jury was a quotient verdict thus rendering it invalid. Security Mutual Finance Corp., 261 So. 2d at 45 (holding that precise agreement between the quotient found and the verdict returned is not required); Warner, 573 So. 2d at 277 (quotient verdict is invalid if the verdict returned is only approximately the same as the quotient arrived at by the jury); Alabama Power Co. v. Thomas, 280 So. 2d at 780 (when quotient verdicts are reached, it must be presumed that the jury members agreed to be bound in advance of reaching the quotient).

Accordingly to the foregoing, the evidence indicates that a quotient verdict was reached by the jury, thus rendering the verdict invalid. Therefore, Defendants request this Honorable to grant their Motion for a New Trial.

## CONCLUSION

Defendants have presented substantial evidence that the question should have been submitted to the jury as to whether the Plaintiffs were borrowed servants for purposes of the exclusivity provision of Alabama's Workmen's Compensation Act. Defendants have demonstrated that it was error to allow Plaintiffs' counsel to impeach Defendant Jordan with psychological

records without first laying the proper predicate. Defendants have also presented evidence showing that a quotient verdict was reached and returned by the jury.

WHEREFORE Defendants respectfully request that this Honorable Court grant their Motion for a New Trial.

13

_R. Larry Bradford_

R. Larry Bradford, Attorney for Defendants
Pemberton, Inc., Adam Pemberton, and Mike
Jordan
Attorney Bar Code: BRA039

_Shane T. Sears_

Shane T. Sears, Attorney for Defendants
Pemberton, Inc., Adam Pemberton, and Mike
Jordan
Attorney Bar Code: SEA026

OF COUNSEL:
BRADFORD & SEARS, P.C.
2020 Canyon Road
Suite 100
Birmingham, AL 35216
(205) 871-7733

_Connie Ray Stockham_

Connie Ray Stockham, Attorney for
Defendants Pemberton, Inc., Adam
Pemberton, and Mike Jordan
Attorney Bar Code: STO040

_James M. Smith_

James M. Smith, Attorney for
Defendants Pemberton, Inc., Adam
Pemberton, and Mike Jordan
Attorney Bar Code: SMI223

OF COUNSEL:

STOCKHAM, CARROLL & SMITH, P.C.
2204 Lakeshore Drive
Suite 114
Birmingham, Alabama 35209
(205) 879-9954

14

## CERTIFICATE OF SERVICE

I hereby certify that I have this the 2ᵗʰ day of June, 2006, served a copy of the foregoing to all attorneys of record by facsimile and by placing a copy of same in the United States Mail, postage prepaid and properly addressed as follows:

Greg J. Davis, Esq.
C. Frank Snowden, Esq.
6987 Halcyon Park Drive
Montgomery, AL 36117

Paul M. James, Jr., Esq.
Rushton, Stakely, Johnston & Garrett, P.A.
184 Commerce Street
Montgomery, AL 36104

Of Counsel

15

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| PEMBERTON, INC. | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) |
| | )   **CASE NO. CV06-504-MEF-WC** |
| | ) |
| GEORGIA MUTUAL INSURANCE | ) |
| COMPANY and ZURICH AMERICAN | ) |
| INSURANCE COMPANY, | ) |
| | ) |
|     Defendants. | ) |

## AFFIDAVIT OF WILLIAM R. DOWNEY

Before me, the undersigned authority, in and for said state and county, personally appeared William R. Downey, who being by me first duly sworn, did depose and say as follows:

1.     My name is William R. Downey. I am the Controller for Georgia Mutual Insurance, a stock company (hereinafter, "Georgia Mutual"). I give this affidavit in connection with that civil litigation known as *Pemberton, Inc. v. Georgia Mutual Insurance Company,* Civil Action Number CV06-504-MEF-WC, which was removed from the Circuit Court of Montgomery County, Alabama to the United States District Court, Middle District of Alabama, Northern Division.

2.     I am over the age of 21 years and competent to testify.

3.   I am familiar with and / or have personal knowledge of the matters stated herein.

4.   Since January 2005, I have been an officer with Georgia Mutual.   My current title is *Controller*.  I have been employed with Georgia Mutual at various times over the years.

5.   On behalf of Georgia Mutual I have researched the plaintiff's allegations in the above-styled action.  In doing so, am familiar with the claim made the basis of the above-styled lawsuit, including the coverage analysis, on behalf of Georgia Mutual.

6.   At all times relevant Georgia Mutual has not issued a contract of insurance or certificate of insurance to Pemberton, Inc.

7.   Jarman Construction is an insured of Georgia Mutual.

8.   Pemberton, Inc. has not presented Georgia Mutual with final judgment against Jarman Construction. Upon information and belief, Pemberton, Inc., has not obtained a judgment against Jarman Construction.

9.   Jarman Construction has not presented Georgia Mutual with a demand for it to indemnify Pemberton Inc., in regard to the judgment against Pemberton, Inc. in the *Silva* and *Sanchez* lawsuit [Circuit Court of Montgomery County, Alabama, CV-05-2343].

Further Affiant saith not.

Page 2 of 3

_William R. Downey_

William R. Downey

STATE OF _GEORGIA_          )
                           )
COUNTY OF _GWINNETT_        )

    Sworn to and subscribed before me by William R. Downey as true and correct on this the _29TH_ day of _FEBRUARY_ , 2007.

_Mary A. Kaman_

Notary Public

My commission expires: _Commission Expires Oct. 31, 2009_

Page 3 of 3